# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

DARRYL ARNOLD,

           Petitioner,

vs.                             Case No. 3:01-cv-1412-J-32HTS

WALTER A. MCNEIL,[1]
et al.,

           Respondents.

_____

## ORDER

At the very same time a corrupt police officer was committing multiple felonies, including selling drugs, robbery and facilitating a murder, he was also serving as a principal investigator and witness for the State against Petitioner Darryl Arnold in a drug prosecution. The corrupt officer's illegal activities were not known to the prosecutor at the time but were, of course, known by the officer himself. In these circumstances, has the State failed to disclose to the defense material information concerning the officer's crimes such that Arnold's due process rights under Brady v. Maryland have been violated? On the facts of this case, the answer is "yes"; the jury's verdict against Arnold was unworthy of confidence and he is entitled to habeas relief.

_____

[1] Walter A. McNeil and Bill McCollum are substituted for James R. McDonough and Charles J. Crist, Jr., as the proper party Respondents pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

# I. Status

Petitioner Darryl Arnold, an inmate of the Florida penal system, initiated this action by filing a *pro se* Petition for Writ of Habeas Corpus (Doc. #1) with an Appendix of Authorities (Doc. #2) and Memorandum of Law (Doc. #3) under 28 U.S.C. § 2254 on December 11, 2001, pursuant to the mailbox rule.[2] On September 15, 2003, this Court appointed counsel to represent Arnold. See Order (Doc. #17). On January 14, 2004, this Court granted Arnold's Motion to Hold Proceedings in Abeyance and stayed this case to permit Arnold to complete exhaustion in state court. See Order (Doc. #23).

On December 14, 2005, this Court granted Arnold's Unopposed Motion to Reopen Proceedings and lifted the stay of the case. See Order (Doc. #25). On January 13, 2006, Arnold, through counsel, filed an Amended Petition for Writ of Habeas Corpus (Doc. #26) (hereinafter Amended Petition) with exhibits (hereinafter Petitioner's Ex.) and a Memorandum of Law in Support (Doc. #26-2) (hereinafter Petitioner's Memorandum of Law). In the Amended Petition, Arnold challenges his 1998 state court (Duval County, Florida) conviction for sale or delivery of cocaine on one ground:

_____

[2] Petitioner is entitled to the benefit of the prison mailbox rule and his documents are deemed filed on the date he delivered them to the prison authorities for mailing to this Court. See Houston v. Lack, 487 U.S. 266, 276 (1988); Day v. Hall, 528 F.3d 1315, 1318 (11th Cir. 2008).

the prosecution, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), failed to disclose favorable evidence to Arnold.

On January 30, 2006, Respondents filed a Response to Amended Petition for Habeas Corpus (Doc. #27) (hereinafter Response).[3] Following discovery, on May 1, 2008, the Court conducted an evidentiary hearing, and both parties submitted exhibits. <u>See</u> Transcript of the Evidentiary Hearing (Doc. #50) (hereinafter EH Tr.); Evidentiary Exhibits (Doc. #49) (hereinafter EH Ex.); Deposition Transcripts (Doc. #48). Before the hearing, the parties filed memoranda and also stipulated to certain facts. <u>See</u> Stipulation (Doc. #45); Respondents' Hearing Memorandum of Facts and Law (Doc. #46) (hereinafter Respondents' EH Memorandum); Arnold's Evidentiary Hearing Memorandum (Doc. #47) (hereinafter Arnold's EH Memorandum). This case is now ripe for decision.

## II. Procedural History

On June 17, 1998, Arnold was arrested and accused of selling crack cocaine following an earlier undercover investigation by Detectives Aric Sinclair and Laval Thomas of the Jacksonville Sheriff's Office ("JSO"). On July 7, 1998, Arnold was charged with one count of the unlawful sale or delivery of cocaine. Respondents' Appendix A, Information.

---

[3] Respondents filed an Appendix. <u>See</u> Response to Petition for Writ of Habeas Corpus (Doc. #6), filed February 27, 2002. These exhibits will hereinafter be referred to as "Respondents' Appendix." Exhibits A and B, attached to Respondents' Response (Doc. #27) will hereinafter be referred to as "Respondents' Ex."

On October 8, 1998, Arnold was tried by a jury in state court in Duval County. Stipulation at 3; Respondents' Appendix O, Transcript of the Jury Trial Proceedings (hereinafter Tr.). Both Detectives Sinclair and Thomas testified for the prosecution, as did a Florida Department of Law Enforcement senior crime lab analyst. Arnold and his mother testified for the defense. On October 9, 1998, the jury found Arnold guilty and the trial court subsequently adjudged Arnold guilty of the sale or delivery of cocaine and sentenced him as a habitual felony offender[4] to twenty-six years of imprisonment. Stipulation at 3.

Arnold, through counsel, appealed his conviction and sentence to the First District Court of Appeal, raising the following claims: (1) the trial court erred in denying his motion for mistrial when Detective Sinclair, contrary to the trial court's prior order, testified concerning the typical behavior patterns of drug dealers; and (2) Arnold was denied a fair trial by improper prejudicial arguments made by the prosecutor during closing arguments. Respondents' Appendix E, Initial Brief. The State filed an Answer Brief, and Arnold filed a Reply Brief. Respondents' Appendices F and G. On October 1, 1999, the First District Court of Appeal per curiam affirmed without issuing a

---

[4] Arnold's criminal record reflects that he had been arrested at least thirty (30) times, with thirteen (13) misdemeanor convictions and seven (7) felony convictions. Respondents' Appendix C, Sentence as Habitual Felony Offender, filed November 18, 1998.

written opinion.  <u>Arnold v. State</u>, 743 So.2d 1078 (Fla. 1st DCA
1999).  The mandate was issued on October 19, 1999.  Respondents'
Appendix I.

On or about April 4, 2000, Arnold filed a *pro se* motion for
post conviction relief pursuant to Fla. R. Crim. P. 3.850, raising
two issues:  (1) ineffective assistance of counsel for his trial
counsel's failure to call Arnold's witnesses (Robert Hill and
Tamika Jones), and to advise him of all plausible defenses; and (2)
deficiencies in the identification evidence used to convict Arnold.
Respondents' Appendix J.  The trial court did not conduct an
evidentiary hearing.

On October 11, 2000, the trial court denied the Rule 3.850
motion, stating in pertinent part:

> In the instant Motion, Defendant alleges
> two grounds for relief.  In Defendant's first
> ground for relief, he alleges that counsel
> rendered ineffective assistance by failing to
> "call Defendant witnesses, and advise
> Defendant of all plausible defences [*sic*] in
> his case."  Specifically, Defendant alleges
> that counsel should have called Robert Hill
> and Tamika Jones to testify that "defendant
> has never attended Andrew Jackson High School,
> did not finish High School, nor played any
> sporting events with said Det./Officer and
> that Officer does not know his family on a
> personal basis."
>
> . . . .
>
> Detective Sinclair testified that he
> "knew [Defendant] from the neighborhood,
> growing up as teenageers [*sic*], we played in
> the same park," and that they attended Andrew
> Jackson High School at the same time despite
> Defendant being "a couple of years ahead" of

the detective. Detective Sinclair also testified that since he had become a police officer he has observed Defendant "frequently in the neighborhood." Finally, Detective Sinclair testified that he was familiar with Defendant's family because of growing up together. (Exhibit "C," pages 210-214.)

Initially, this Court will note that both Defendant and his mother, Willie Mae Arnold, testified at trial concerning the exact issues that Defendant now suggests the additional witnesses should have testified to. Defendant testified that despite knowing Detective Sinclair and the detective knowing some people in his family, Defendant never attended Jackson High School nor had he ever seen Detective Sinclair in the park. (Exhibit "C," pages 271-273.) Defendant's mother testified that the detective grew up in the neighborhood with Defendant and that she knew the detective's parents. But she testified that Defendant never attended Andrew Jackson High School and that he did not play much basketball in the park and that she had never observed Detective Sinclair playing basketball with her son. (Exhibit "C," pages 295-297.) Therefore, any further testimony concerning this information would have been cumulative.

Finally, even assuming, *arguendo,* that counsel was in fact able to impeach Detective Sinclair as Defendant alleges, Detective Thomas also testified that Defendant was involved in the drug transaction. Detective Thomas identified Defendant as the person who sold him cocaine while the detective was operating in an undercover capacity. Detective Thomas also identified Defendant as the culprit the day after the incident by looking at a photograph of Defendant. (Exhibit "C," pages 151-152, 168-169.) Therefore, Defendant has failed to demonstrate prejudice.

. . . .

It appears that Defendant is alleging that counsel failed, contrary to Defendant's

request to present a defense of
misidentification. Defendant's assertion is
belied by the record. First, Defendant
testified that he did not commit the offense.
Defendant maintained that he was with his
former girlfriend when the offense occurred.
(Exhibit "C," pages 274-275.) Second,
Defendant's mother testified that there was an
individual in the neighborhood who resembled
defendant. (Exhibit "C," pages 297-298.)
Finally, during closing argument[,] counsel
argued the following:

> Whether it was Mr. Arnold's double
> or someone else, it was not Mr.
> Arnold. There are a couple of other
> things that you can look at to know
> that Mr. Arnold is not the person
> who sold cocaine on that day. First
> of all, Detective Thomas said the
> seller removed the cocaine with his
> right hand from his right pocket and
> if you've been watching Mr. Arnold,
> he's been writing during this trial
> some. He's left handed. Mr. Arnold-
> well, the other thing that we don't
> have is the money. Where is the
> money? The marked money that was
> given. I don't want to use a
> cliche, but show me the money. We
> don't have it.

(Exhibit "C," page 362);

> They're out there trying to clean up
> the streets and maybe they are doing
> it, but the thing is that old saying
> all is fair in love and war should
> not apply here because the war
> should not be won at all costs, it
> should not be won at the cost of
> convicting innocent people and Mr.
> Arnold is innocent. I told you at
> the beginning this was a case about
> police making mistakes. Detective
> Sinclair made a mistake. He thought
> that the person who sold drugs that
> day was Mr. Arnold. Detective

Thomas made a mistake. He went to
the photograph the next day and
thought that that was the person who
sold drugs. I ask you, you don't
make a mistake. Mr. Arnold is not
guilty. He's innocent and I ask you
to find him so.

Exhibit "C," pages 367-368.) As these
portions of the record make abundantly clear,
defense counsel did, in fact, present a
defense of misidentification. Therefore,
Defendant has failed to demonstrate either
deficient performance on counsel's behalf or
prejudice to his case.

In Defendant's second ground for relief,
he maintains that there are problems with
eyewitness identification during trial and
that "human perception is sloppy and uneven
. . . ." Defendant asserts that "the
unreliability of eyewitness identification
poses especially serious problems in the
administration of criminal justice. It is
known that faulty identification present
'conceivably the greatest single threat to the
achievement of our ideal that no innocent man
shall be punished.[']" Defendant also asserts
that "there were inconsistencies in the
testimony of Det. A. Sinclair concerning
identification of Defendant."

Defendant appears to be attempting to
challenge the sufficiency of the factual basis
for his convictions. Alleged insufficiency of
the evidence cannot be raised in a Motion
seeking Post-Conviction Relief. See <u>Jackson
v. State</u>, 640 So.2d 1173 (Fla. 2d DCA 1994).
Moreover, to the extend [sic] that Defendant
wishes to challenge the validity of the in
court identification made of him by the
detectives, his arguments could or should have
been raised on direct appeal, and are thus
procedurally barred. See <u>Harvey v. Dugger</u>,
656 So.2d 1253 (Fla. 1995); <u>Cherry v. State</u>,
695 So.2d 1069 (Fla. 1995); <u>Jackson v. State</u>,
646 So.2d 792 (Fla. 2d DCA 1994).

Respondents' Appendix K at 1-5.

Arnold appealed and filed his *pro se* Initial Brief. Respondents' Appendices L and M. On May 22, 2001, the First District Court of Appeal per curiam affirmed without written opinion. <u>Arnold v. State</u>, 788 So.2d 964 (Fla. 1st DCA 2001). The mandate was issued on June 19, 2001. Respondents' Appendix N.

Arnold's initial *pro se* Petition in this Court argued the following three grounds: (1) the State intentionally withheld evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), that Detective Aric Sinclair, who played a significant role in the State's case and was a key witness for the State in Arnold's trial, was indicted and pled guilty to crimes committed during the same approximate time frame as the crime for which Arnold was convicted, including, among other crimes, conspiracy to distribute cocaine and conspiracy to obstruct justice; (2) ineffective assistance of trial counsel for counsel's failure to produce alibi witnesses, as requested by Arnold; and; (3) improper identification of Arnold as the perpetrator.

Following some early motion practice, the Court stayed and administratively closed this federal action while Arnold, through appointed counsel, returned to state court and filed a second motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850(a)(6). In his motion, Arnold explained that "the State of Florida intentionally withheld evidence that Detective Aric

9

Sinclair . . . , a key witness for the State during Petitioner's criminal trial, was indicted and subsequently pled guilty to crimes committed during the approximate time frame as the crime for which Petitioner was convicted." Respondents' EH Ex. 1 (hereinafter second Rule 3.850 motion). Arnold further explained the effect of this evidence:

> Sinclair's criminal activity seriously undermines his credibility both as a key witness for the State during Petitioner's criminal trial and as a primary investigator during the undercover operation leading to Petitioner's arrest. This is particularly true since Sinclair was admittedly involved in illegal drug activity during the same time frame as Petitioner's arrest. Had Petitioner received this critical exculpatory information, Petitioner would have been acquitted of the charges against him.

Id.

The state court ordered the State to file a response to Arnold's motion, which the court characterized as "essentially assert[ing] that the State committed a Brady violation by withholding evidence that Officer Sinclair [was] under federal investigation." Petitioner's Ex. The State did so, explaining in a single paragraph that there was no Brady violation because the prosecutor who tried Arnold had no knowledge of Sinclair's criminal activity or of any federal investigation concerning Sinclair, and because the federal investigation of Sinclair did not commence until after Arnold's trial. Respondents' Ex. A. On January 21, 2005, without conducting an evidentiary hearing or oral argument,

the trial court, which had earlier recognized that Arnold was raising a <u>Brady</u> claim, denied the second Rule 3.850 motion on a different basis, stating Arnold failed to meet the newly discovered evidence standard under Florida law:

> In the Defendant's instant Motion, he alleges newly discovered evidence. The Defendant contends that the State withheld favorable evidence from the defense by failing to inform the defense that Detective Aric Sinclair of the Jacksonville Sheriff's Office was under federal investigation at the time of the Defendant's trial and was subsequently indicted and convicted of federal offenses. In order to be considered newly discovered, "the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known of it by the use [o]f diligence." <u>Jones v. State</u>, 709 So.2d 512, 521 (Fla. 1998).

> The Defendant has failed to establish that the federal investigation and subsequent trial and conviction of Aric Sinclair constitutes newly discovered evidence as defined in <u>Jones</u>. Initially, this Court notes that the Defendant was charged with committing the instant offense on May 27, 1998, by way of an Information filed on July 7, 1998. (Exhibit "C.") Further, the federal investigation of Aric Sinclair did not commence until or about September 9, 1999. (Exhibit "D.") Finally, the prosecuting Assistant State Attorney, Curtis Pajcic, states in a sworn Affidavit that he was not aware of any criminal investigation against Aric Sinclair during the time he prosecuted the Defendant. (Exhibit "E.") Accordingly, this Court finds that the alleged newly discovered evidence does not satisfy the first prong of the newly discovered evidence test set forth in <u>Jones</u>. The State could not have been aware of the federal investigation of Aric Sinclair at the time of the Defendant's

> trial, since that investigation did not commence until ten months after the Defendant's conviction. Therefore, Defendant's claim is without merit.

Respondents' EH Ex. 2.

On June 3, 2005, the First District Court of Appeal per curiam affirmed without written opinion. Arnold v. State, 903 So.2d 191 (Fla. 1st DCA 2005). Arnold then returned to this Court and filed the Amended Petition (Doc. #26) raising the Brady issue regarding Sinclair. Respondents acknowledge, and this Court agrees, that the Petition in this case has been timely filed.

### III. Stipulated Facts Concerning Detective Aric Sinclair

The parties have stipulated to facts relating to former Detective Aric Sinclair. Sinclair's criminal acts, his 2001 guilty plea and convictions (for conspiracy to commit a civil rights violation leading to the murder of Sami Safar, conspiracy to distribute cocaine and conspiracy to obstruct justice) and his resulting seventeen-year federal sentence are relevant to Arnold's claim now before this Court. Therefore, the stipulated facts are set forth as follows:

> 5. In connection with [Aric Sinclair's] plea agreement in the case of U.S. v. Waldon, et al., United States District Court, Middle District of Florida, Jacksonville Division, Case No. 3:00-cr-436-(S1)-J-25TJC, Sinclair admitted the following facts:

> [a]. In April 1996, [Sinclair] was working as a patrol officer for the Jacksonville Sheriffs Office ("JSO"). On April 23, 1006 [sic], [Sinclair] and another JSO

12

officer, Jason Pough, seized U.S. currency from a Jacksonville citizen, Claude Wright during a routine traffic stop of Wright and his brother in Jacksonville. Instead of placing the currency in the JSO property room, [Sinclair] and Pough split the money and kept it for their personal use.

[b]. On April 1, 1997, [Sinclair] was working as a patrol officer and arrested Daryl Crowden on an outstanding warrant for a drug related charge. Upon searching Crowden, [Sinclair] found a small amount of marihuana and a small amount of cocaine. [Sinclair] charged Crowden with possession of marihuana, but did not charge Crowden with possession of cocaine, telling Crowden in substance that Crowden owed him one.

[c]. As time passed in 1997, [Sinclair] saw Crowden on occasion when [Sinclair] was working secondary employment as security at a Winn Dixie super market. [Sinclair] also saw Crowden at other places in Jacksonville. Eventually, Crowden and [Sinclair] became friends.

[d]. In about November 1997, [Sinclair] was transferred from patrol to the narcotics unit. He reported this to Crowden. Sinclair was assigned to Sgt[.] McKenney's unit.

[e]. By late 1997, JSO officer Karl T. Waldon and Jason Pough also were assigned to the narcotics unit. Waldon and Pough were assigned to Sgt[.] Bennett's unit. Beginning at least as early as January 1998, Pough, Waldon, and [Sinclair], among others, routinely seized U.S. currency during the execution of search warrants and illegally and unlawfully kept a portion of the money for their own personal use. This included seizing U.S. currency from James Battle during the execution of a search warrant at 1226 Harrison Street in Jacksonville on February 24, 1998, and dividing a portion of the money amongst Pough, Waldon, and [Sinclair].

[f]. In about late March or early April 1998, Crowden and [Sinclair] devised a plan in which [Sinclair] would seize a quantity of cocaine from one of Crowden's cocaine suppliers and then provide the cocaine to Crowden to sell. One evening in late March or early April 1998, Crowden ordered a kilogram of cocaine from one of his (Crowden's) suppliers. Crowden advised [Sinclair] in substance that he (Crowden) and the supplier would leave Crowden's residence and eventually drive west on Trout River Blvd. toward U.S. 1. [Sinclair] did not have a marked patrol car assigned to him because he was in the narcotics unit. Consequently, [Sinclair] borrowed a marked JSO unit so that he could perform the traffic stop and seize the kilogram of cocaine.

[g]. [Sinclair] stopped the vehicle on Trout River Blvd., allegedly for speeding. He eventually searched the vehicle and seized a kilogram of cocaine from a briefcase in the back seat of the supplier's vehicle. [Sinclair] advised the supplier and Crowden in substance that his shift was about over so he was not going to arrest them at that time. [Sinclair] further advised them in substance that if their fingerprints were later found on the package of cocaine, he would arrest them. [Sinclair] also seized a sum of U.S. currency and kept it for himself.

[h]. After seizing the cocaine and money, [Sinclair] released Crowden and the supplier from custody. Later that same evening, [Sinclair] met Crowden and provided the cocaine to him for distribution. Later, Crowden gave [Sinclair] a portion of the money he (Crowden) made from selling the cocaine.

[i]. Sometime in April 1998, [Sinclair], Waldon, and Pough went to Super 8 Motel on Phillips Highway, where an individual was supposed to be in possession of cocaine. Waldon and Pough entered the individual's room and searched it for the cocaine. They found about a quarter kilogram of cocaine under the

bed mattress. [Sinclair] eventually took possession of the cocaine and provided it to Crowden to sell. [Sinclair] gave Pough and Waldon each $1000.00.

[j]. In early May 1998,[5] Waldon, who had left the narcotics unit and had returned to a patrol unit, contacted [Sinclair] and advised [Sinclair] in substance that he (Waldon) had assisted two narcotics detective[s] in the arrest of a drug dealer who lived at LondonTowne Apartments in Jacksonville. Waldon had transported him to the Drug Enforcement Administration Office. According to Waldon, the drug dealer was supposed to have a large sum of money in his apartment. Waldon asked Sinclair to get Crowden to go to the drug dealer's apartment and steal the money. Waldon indicated that they needed to hurry because he did not know how long the drug dealer would be at the DEA office.

[k]. [Sinclair] contacted Crowden and eventually met Crowden and his brother, Jeff Reed, a/k/a Bulldog, in the Paxon area of Jacksonville. He told them about the planned break-in at the LondonTowne Apartments. Crowden and Reed agreed to the plan and went to LondonTowne Apartments. Later that day, Crowden reported to [Sinclair] that when he and Reed arrived at the drug dealer's apartment, it appeared that someone had already broken into the apartment and had searched it.

[l]. After the LondonTowne incident, [Sinclair] and Crowden discussed robbing a bank customer who would be in possession of a large sum of money when the customer was leaving the bank. [Sinclair] worked secondary employment at the bank as security and knew the routine of the customers. The Bank was located on West 44th Street in Jacksonville.

---

[5] The crime for which Arnold was convicted allegedly occurred on May 27, 1998.

[m]. On May 15, 1998, consistent with the plans [Sinclair] and Crowden had made previously, Crowden and Reed went to the area of the South Trust Bank to rob a customer identified by [Sinclair]. [Sinclair] was working at the bank that day and communicated with Crowden via cellular phone. About 1:15 p.m., [Sinclair] exited the bank with Hussam Tahhan, an employee of a Jacksonville convenience store. Mr. Tahhan was in possession of approximately $50,000.00 in U.S. currency that he had just withdrawn from the bank to be used to, among other things, cash payroll checks.

[n]. Instead of escorting Mr. Tahhan to his vehicle, [Sinclair] walked right back into the bank, so that he would not be present in the parking lot when the robbery occurred. As Mr. Tahhan walked to his vehicle, Reed approached Mr. Tahhan with a firearm and demanded the money. Mr. Tahhan threw the bag containing the money into the vehicle and ran back into the bank. Reed took the money, got back into his car, and fled the area. In the meantime, [Sinclair], having been advised of the robbery by Mr. Tahhan, exited the bank, got into his vehicle, and pretended to pursue Reed's vehicle.

[o]. Later that evening, [Sinclair] met Crowden. Crowden gave [Sinclair] his share of the money that had been taken from Mr. Tahhan.

[p]. On May 23, 1998,[6] Waldon called [Sinclair] and asked him in substance to get Crowden to assist them in breaking into an individual's residence. The individual was supposed to have a large sum of money in his residence. [Sinclair] contacted Crowden and asked him to get someone else and meet him ([Sinclair]) in a parking lot near Beach Blvd. Eventually, Crowden met with [Sinclair] and Waldon in a parking lot, at which time Waldon

---

[6] This was four days before Sinclair identified Arnold as the perpetrator of the drug deal for which Arnold was convicted.

explained the plan to [Sinclair] and Crowden.
Waldon then showed [Sinclair] and Crowden
where the intended victim lived. Waldon said
he would park his marked patrol unit at the
entrance to the subdivision where the
residence was located and act as a lookout. A
short time later, an associate of Crowden
attempted to enter the targeted residence but
cut his leg in the process. The plan was
aborted.

[q]. In June 1998, Waldon stopped by the
South Trust Bank on West 44th Street to talk
to [Sinclair]. Waldon in substance told the
[Sinclair] he was sorry the way the May 23,
1998 incident was handled. Both [Sinclair] and
Waldon agreed it had been sloppy. Waldon also
advised [Sinclair] in substance that other
police officers were suspicious [Sinclair] was
involved in the May 15, 1998 robbery of the
convenience store employee that had occurred
at the bank. [Sinclair] denied having been
involved. Waldon then asked [Sinclair] a
number of questions about Sami Safar, the
owner of the convenience store where Mr.
Tahhan was employed. He told [Sinclair] in
substance he (Waldon) and "J" (Jason Pough)
wanted to get a "lick," meaning he wanted to
rob Sami Saf[a]r. Waldon asked [Sinclair] to
help him, but [Sinclair] declined, believing
that another robbery associated with the bank
would be too suspicious and bring focus of law
enforcement on him. In the course of the
conversation, however, [Sinclair] told Waldon,
among other things, that Mr. Safar drove a
green SUV and usually withdrew a large sum of
money on Fridays.

[r]. On July 3, 1998,[7] a Friday,
[Sinclair] was working secondary employment at
the South Trust Bank on West 44th Street. At
about 9:55 a.m., he walked Sam Safar to Mr.
Safar's vehicle. Mr. Safar had just withdrawn
approximately $51,000.00 for his convenience

---

[7] This was four days before the Information was filed against
Arnold.

17

store. Sometime in the afternoon, [Sinclair] heard that Sami Safar had not returned to his convenience store that morning and was believed to be missing. [Sinclair] was immediately suspicious that Waldon and Pough had gotten the "lick" Waldon said he wanted.

[s]. When [Sinclair] left work that evening, he drove east on West 44th Street. He heard someone behind him honking the horn and saw a police car in the rear view mirror. He pulled into a parking lot and saw that the person in the car was Waldon.

[t]. Waldon appeared to be excited. He told [Sinclair] in substance that he had made the "lick" on Sami Safar, meaning he had robbed Sami Safar. Waldon said in substance that things got out of hand because Sami Safar would not give him the money. Waldon said he had to choke Mr. Safar. Waldon repeated a number of times that Mr. Safar would not give him the money and he had to choke him. Waldon said in substance that he choked Mr. Safar and "Slick" suffocated him. [Sinclair] did not know who Waldon was referring to when he spoke of "Slick." Waldon further told [Sinclair] that Mr. Safar's body had been dumped off Pritchard Road.

[u]. [Sinclair] then drove from where he and Waldon were to the Pritchard Road area. [Sinclair] used his cellular phone to call Crowden. He told Crowden to meet him at a truck stop at I-295 and Pritchard Road. [Sinclair] drove up and down Pritchard Road to see if there was any police activity, that is, to see if Mr. Safar's body had been found. He did not see anything.

[v]. [Sinclair] and Crowden met at a truck stop. [Sinclair] told Crowden in substance that Waldon had robbed Sami Safar and Mr. Safar had been killed. [Sinclair] in substance said he did not have anything to do with the robbery; he just gave Waldon information that Waldon used to commit the robbery. [Sinclair] instructed Crowden in

substance to tell Reed that law enforcement would pick up the pressure and that Reed and Crowden did not need anything to bring attention to themselves. [Sinclair] also told Crowden that if anything happened to him ([Sinclair]), Crowden should tell the police w[hat] Waldon had done.

[w]. The next week, [Sinclair] was interviewed by a JSO homicide detective regarding Sami Safar's murder. He falsely stated that when Mr. Safar left the bank on July 3, 1998, he turned left on West 44th Street and then right on Norwood. In truth and fact, Mr. Safar had turned right on West 44th Street. [Sinclair] misled the detective to distance himself from the murder and robbery and to help cover it up.

6. Detectives Sinclair, Waldon, Pough and another JSO detective involved in the criminal conduct, Reginald Bones, worked in JSO's narcotics unit.

7. The facts contained in the subparagraphs 5[a.]-[w.], above, were not revealed to Arnold's defense counsel prior to or during Arnold's trial.

8. The federal investigation of Sinclair commenced about September 9, 1999 and was publicly announced about the same time.

9. The lead prosecutor at Arnold's trial, Curt Pajcic, if called as a witness here, would testify that he had no knowledge of Sinclair's criminal acts up to the date of Arnold's trial at the time of Arnold's trial.

10. On September 4, 2001, Sinclair entered a plea agreement in the case of U.S. v. Waldon. Pursuant to that agreement, he pled guilty to these charges:

a. Count I: conspiracy to commit civil rights violation leading to the murder of Safar in violation of 18 U.S.C. § 241;

b. Count II: conspiracy to distribute cocaine in violation of 2l U.S.C. § 846;

c. Count XVII: conspiracy to obstruct justice in violation of 18 U.S.C. § 371.

11. Sinclair was sentenced to 17 years in federal prison following his plea agreement.

<u>See</u> Stipulation at 4-12.

## IV. Findings of Fact and Conclusions of Law

### A. Procedural Default

Now before this Court, Arnold claims the prosecution suppressed favorable evidence in violation of <u>Brady</u>. Specifically, he alleges:

> The criminal activities engaged in by Aric Sinclair and his bias and motive to lie during Arnold's trial were known by the state but were not disclosed to the defense. This information was material, prejudicial and denied Arnold his fundamental due process rights.

Amended Petition at 6. As previously noted, Arnold returned to state court to raise the <u>Brady</u> claim in the second Rule 3.850 motion since the claim was discovered after the direct appeal and after the first Rule 3.850 motion had been filed.[8] In comparing

---

[8] Arnold, who was <u>pro</u> <u>se</u> at the time, stated that he did not raise the <u>Brady</u> claim on direct appeal or in the first Rule 3.850 motion because he did not become aware of "the information necessary to form the basis of the claim" until he was preparing his Petition, which was filed in federal court on December 14, 2001, at which time "he learned of the allegations made against Sinclair." Second Rule 3.850 Motion at 2, paragraph 7; Amended Petition at 6.

the facts relied upon by Arnold in the second Rule 3.850 motion and those presented here in Arnold's Memorandum of Law, Respondents contend that Arnold has relied upon new facts for the first time in this Court and thus has not fully exhausted the Brady claim. Respondents state that Arnold, in addition to those facts presented in state court, now relies upon the following three factual circumstances: (1) Sinclair's criminal activity (May 15, 1998) occurred less than two weeks before Arnold's arrest (May 27, 1998)[9]; (2) Sinclair actually participated in the robbery of a local businessman on May 15, 1998; and (3) Sinclair declined to participate in another robbery because the "heat" was on from the first robbery. Response at 4-5.

Further, Respondents contend that Arnold, for the first time in this Court, now advances the legal theories that Sinclair's self-contained knowledge of his own criminal activities must be imputed to the prosecution, or alternatively, that the Jacksonville Sheriff's Office should have known of the criminal activities and this knowledge should be imputed to the prosecution.

This Court concludes that, while Arnold has slightly expanded upon his rendition of the facts and legal theories supporting his

---

[9] Arnold was actually arrested on June 17, 1998. May 27, 1998 was the date Detective Thomas purchased the crack cocaine in the undercover buy leading to Arnold's arrest.

<u>Brady</u> claim,[10] his claim before the state court that "Sinclair's criminal activity seriously undermines his credibility both as a key witness for the State during Arnold's criminal trial and as a primary investigator during the undercover operation leading to Petitioner's arrest;" that Sinclair's "illegal drug activity during the same time frame as Petitioner's arrest" was "critical exculpatory information;" and that the State intentionally withheld evidence regarding the State's key witness, Aric Sinclair, is the same <u>Brady</u> claim as is raised here.[11]  Arnold has sufficiently exhausted the <u>Brady</u> claim that he now presents to this Court in the Amended Petition.

## B. Deference

Respondents contend that this <u>Brady</u> claim should be addressed applying the deferential standard for federal court review of state court adjudications, as required by the Antiterrorism and Effective

---

[10]As would be expected, the parties' discovery efforts (undertaken in preparation for this Court's evidentiary hearing on Arnold's amended petition), resulted in a further refinement of the issues.

[11]That the second Rule 3.850 motion would contain the gist of the claim without a full development of the factual and legal support is consistent with local state court practice, which usually contemplates that the court will conduct a hearing on the motion at which the parties will flesh out the arguments.  While it is true that Arnold's counsel did not request a hearing, it is also true that neither side's brief contained much in the way of recitation of the factual development or citation to legal authority, but the court ruled on the motion without holding a hearing, citing law on newly-discovered evidence not put forward by either side.

Death Penalty Act of 1996 (hereinafter AEDPA), 28 U.S.C. § 2254(d).[12] Arnold contends that "[t]he state court failed to apply the specific elements set forth in <u>Brady</u> to the facts in Arnold's case," Petitioner's EH Memorandum at 6-7, and therefore no AEDPA deference is required.

Arnold raised the <u>Brady</u> claim in state court in his second Rule 3.850 motion. The state trial court identified the <u>Brady</u> claim[13] and ordered the State to file a written response to it. Petitioner's Ex. H. The State responded to the <u>Brady</u> claim. Respondents' Ex. A. Thus, the state court recognized that Arnold

---

[12]Under AEDPA review of the decisions of the state courts:

> A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

<u>Diaz v. Sec'y for the Dep't of Corr.</u>, 402 F.3d 1136, 1141 (11th Cir.)(citing <u>Clark v. Crosby</u>, 335 F.3d 1303, 1307-08 (11th Cir. 2003) (citations omitted)), <u>cert</u>. <u>denied</u>, 546 U.S. 1064 (2005). <u>See generally</u>, <u>Knowles v. Mirzayance</u>, ___S.Ct.___, 2009 WL 746274 (Mar. 24, 2009) (discussing AEDPA standard).

[13] In its Order directing the State to respond to Arnold's second Rule 3.850 motion, the trial court stated that "[Arnold] essentially asserts that the State committed a <u>Brady</u> violation by withholding evidence that Officer Sinclair [was] under federal investigation." Petitioner's Ex. H.

had raised a <u>Brady</u> claim. However, in its decision on Arnold's motion, the state court did not mention <u>Brady</u> and instead, stating that Arnold had raised a newly-discovered evidence claim under state law, the state court articulated the standard under Florida law set forth in <u>Jones v. State</u>[14] for newly-discovered evidence. When applying this standard to the facts of Arnold's case, however, the state court appears to have conflated the first prong of the newly-discovered evidence standard with the first prong of a <u>Brady</u> analysis, focusing on whether the *prosecution* possessed favorable evidence (a <u>Brady</u> analysis) to find that Arnold failed to meet "the

---

[14] In <u>Jones v. State</u>, the Florida Supreme Court stated that, in order to be considered newly discovered, first "the evidence 'must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence[,]'" and "[s]econd, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." 709 So.2d 512, 521 (Fla.) (citations omitted), <u>cert</u>. <u>denied</u>, 523 U.S. 1040 (1998). The <u>Jones</u> case also presented a <u>Brady</u> claim which the Florida Supreme Court reviewed and rejected for several reasons including that the defendant failed to demonstrate that he could not have obtained the evidence himself with diligence, the officer whose information the defendant sought to obtain was not involved in defendant's case, and there was not a reasonable probability that the evidence would have made a difference to the outcome. <u>Id</u>. at 520-21. Interestingly, in <u>Jones</u>, the Florida Supreme Court reiterated the principle applicable here that a prosecutor's ignorance regarding the existence of favorable evidence known only by the police is no excuse for failing to disclose it, because a prosecutor is charged "with constructive knowledge and possession of evidence withheld by . . . law enforcement officers" and such disclosure is essential to "the government's obligation to ensure fair trials." <u>Id</u>. Further, the <u>Jones</u> court "agree[d] with the general proposition that evidence suppressed by the police can constitute a <u>Brady</u> violation," but found it did not apply to the facts of Jones' case. <u>Id</u>.

first prong of the newly discovered evidence test set forth in _Jones_" (which asks whether the _court and the defense_ knew of the evidence, _Jones_, 709 So.2d at 521). Respondents' EH Ex. 2. On this record, the Court finds that the state court failed to address the merits of Arnold's _Brady_ claim and this Court therefore will not accord its decision deference under AEDPA. See _DiBenedetto v. Hall_, 273 F.3d 1, 6 (1st Cir. 2001) (declining to accord deference under AEDPA and reviewing claim _de novo_ where state court did not address habeas claim on merits); _Hameen v. State of Delaware_, 212 F.3d 226, 248 (3rd Cir. 2000) (same); _Billings v. Polk_, 441 F.3d 238, 252 (4th Cir. 2006) (same); _Mercadel v. Cain_, 179 F.3d 271, 275 (5th Cir. 1999) (same); _Lyell v. Renico_, 470 F.3d 1177, 1182 (6th Cir. 2006) (same); _Pirtle v. Morgan_, 313 F.3d 1160, 1167 (9th Cir. 2002) (same); _Neill v. Gibson_, 278 F.3d 1044, 1053 (10th Cir. 2001) (same).

Alternatively, to the extent the state court decision is considered a ruling on the merits of Arnold's _Brady_ claim, the court unreasonably applied the Supreme Court precedent of _Brady v. Maryland_ (and its progeny) to the facts of Arnold's case: the state court stopped far short in its analysis under _Brady_, focusing solely on the timing of the federal investigation and the individual prosecutor's lack of knowledge regarding Sinclair, instead of taking the further step (as was, ironically, done in _Jones_) to consider who else on the prosecution team (such as

Sinclair himself) may have known about the favorable evidence. Given that <u>Brady</u> was the issue, and that Supreme Court precedent available at the time established that the State's <u>Brady</u> disclosure obligation does not end with the prosecutor's own personal knowledge, <u>see</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995); <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), the state court's short-circuited analysis resulted in a decision here that was contrary to, or involved an unreasonable application of, clearly established federal law. <u>See</u> <u>Williams v. Allen</u>, 542 F.3d 1326, 1336 (11th Cir. 2008) (finding petitioner entitled to habeas relief where state court decision involved an unreasonable application of federal law, defined as a state court decision which "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" (citation omitted)), <u>petition for cert. filed</u>, 08-1032 (U.S. Feb. 11, 2009). Thus, the Court will not accord AEDPA deference to the state courts' rulings and will address Arnold's <u>Brady</u> claim on the merits.

## C. Merits

Relying on earlier Supreme Court precedents which held that due process is not satisfied if a defendant's conviction is secured and his liberty is deprived "through a deliberate deception of the

court and jury,"[15] the Supreme Court in Brady v. Maryland extended those principles to hold that due process is likewise violated when a prosecutor- - whether in good faith or bad faith- - withholds material evidence favorable to the accused.  373 U.S. 83, 86-87 (1963).  See also, Porter v. White, 483 F.3d 1294, 1303 (11th Cir. 2007) (explaining that Brady rule protects the "defendant's right to a fair trial mandated by the Due Process Clause of the Fourteenth Amendment to the Constitution" (quoting U.S. v. Agurs, 427 U.S. 97 (1976)), cert. denied, 128 S.Ct. 1259 (2008). As articulated by the Eleventh Circuit,

> In Brady v. Maryland, the Supreme Court placed an affirmative duty on the prosecution to reveal any "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S.Ct. at 1196-97.  This duty covers "[i]mpeachment evidence . . . as well as exculpatory evidence."  United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).  The Brady rule applies to evidence possessed by the prosecution team, which includes both the investigators and prosecutors.  See United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).

Stephens v. Hall, 407 F.3d 1195, 1203 (11th Cir.), cert. denied, 546 U.S. 913 (2005).  A conviction will be set aside for a Brady

---

[15]Mooney v. Holohan, 294 U.S. 103, 112 (1935) (addressing State's use of perjured testimony as violative of due process); Pyle v. Kansas, 317 U.S. 213, 216 (1942) (citing Mooney and addressing state's use of perjured testimony and its suppression of favorable testimony as causing deprivation of defendant's constitutional rights).

violation where the defendant shows: "(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceeding would have been different." <u>United States v. Newton</u>, 44 F.3d 913, 918 (11th Cir.), <u>cert</u>. <u>denied</u>, 516 U.S. 857 (1995). <u>See also</u>, <u>United States v. Butler</u>, 275 Fed. Appx. 816, 819-20 (11th Cir.) (not selected for publication in the Federal Reporter), (citing <u>Newton</u> for four-part standard), <u>cert</u>. <u>denied</u>, 129 S.Ct. 171 (2008). <u>Cf</u>. <u>Gary v. Hall</u>, ___ F.3d ___, No. 04-15535, 2009 WL 331605, at *22 (11th Cir. Feb. 12, 2009) (articulating commonly used (and substantively similar) three-part standard for establishing <u>Brady</u> violation).

With respect to the first prong, Respondents agree that evidence of Sinclair's criminality would have been favorable to the defense at least for impeachment purposes. Respondents' EH Memorandum at 9-10; <u>see</u> Petitioner's EH Memorandum at 9. Sinclair was admittedly involved in criminal activity, including facilitating murder, robbery and dealing in cocaine during the same time frame as Arnold's arrest and trial. Stipulation at 4-12. This criminal activity included using his authority as a police

officer to coerce drug dealers into doing his criminal bidding. Arnold was arrested on June 17, 1998, after an undercover drug investigation on May 27, 1998, where Sinclair was a primary detective on the case and the only person to identify Arnold at the scene as the seller of the cocaine. In the months preceding Arnold's arrest, Sinclair used his position as a police officer to facilitate the theft of drugs and money from numerous individuals and on May 15, 1998, just days before the May 27, 1998 drug buy that resulted in Arnold's arrest, Sinclair, who was performing off-duty security work at a bank, orchestrated and participated in the robbery of Hassam Tahhan. Id. at 7-8; see United States v. Waldon, 363 F.3d 1103, 1107 (11th Cir. 2004).

Moreover, just after the arrest of Arnold, but before Arnold's October 1998 trial, JSO Officer Waldon approached Sinclair about assisting him in another robbery of another customer of the bank (Sami Safar). Stipulation at 8-9. Sinclair provided Waldon with a description of Safar's vehicle and told Waldon that Safar usually withdrew large sums of money on Fridays, "but refused to assist him in another robbery because 'the heat [was] on' from the first robbery." Waldon, 363 F.3d at 1107; Stipulation at 9.

On July 3, 1998, Waldon and others, using the information provided by Sinclair, robbed and murdered Safar. Stipulation at 9-10. Within a week, a Jacksonville Sheriff's Office homicide detective interviewed Sinclair. Stipulation at 11. Sinclair

misled the detective to protect himself and Waldon and to help cover up his crimes. Id. All this occurred before Sinclair came into state court on October 8, 1998, and testified against Arnold at his trial. Thus, as conceded by Respondents, this evidence of Sinclair's ongoing criminal acts would have been favorable to the defense for impeachment. Putting aside for the moment the question of whether the state "possessed" this evidence,[16] there is no dispute that the evidence about Sinclair would have been favorable to Arnold's defense within the meaning of Brady.[17]

As to the second prong, Respondents agree that the Sinclair evidence "could not have been in Arnold's possession at [the] time of trial, with due diligence, because it was as well concealed from [Arnold] as it was from the JSO and prosecution." Respondents' EH Memorandum at 10 (citing Detective Bisplinghoff's Deposition at 18, 32 (noting Sinclair concealed money in a shoe box rather than have

---

[16]Whether the State "possessed" the favorable evidence is addressed below with prong three, which considers whether the State "suppressed" evidence favorable to the defense.

[17]In addition to impeachment evidence, there is also a possibility that exculpatory evidence favorable to Arnold might have been uncovered as well. Part of Sinclair's "modus operandi" was to share in drug dealers' profits by theft or coercion. As is discussed further below, Arnold was a seven time felon who Sinclair knew and, according to Arnold, Sinclair had asked Arnold to sell drugs for Sinclair- - a request which Arnold refused- - thereby giving Sinclair (says Arnold) a motive to seek retribution against Arnold. Where Arnold has consistently maintained his innocence and his defense at trial was one of misidentification, Sinclair's testimony as the only witness who could identify Arnold by sight was the key to Arnold's conviction and exculpatory evidence favorable to Arnold may well have been known to Sinclair.

it appear in financial records and further took illegal drugs from people during traffic stops so there would not be a complaint that a police officer stole the drugs)); EH Tr. at 24. More than two years after Arnold's trial, on May 7, 2001, Arnold's defense counsel (Ms. Susan E. Brooks, Assistant Public Defender), notified the Chief Assistant and the Felony Supervisor of the Public Defender's Office as follows:

> As you know, Det. Sinclair is under federal investigation right now for several serious offenses, including making illegal drug deals. At the time of Mr. Arnold's case, <u>I had heard rumors of Det. Sinclair's involvement in several drug deals from various clients and attorneys, including Gonzalo Andux, who then represented Theodis Hagans.</u>

> Because of Det. Sinclair's being under investigation, his credibility in cases in which he played a significant role, especially where he testified, is questionable. It is even more questionable where he had a motive to frame or get revenge on someone as a means of covering up his own illegal involvement.

> <u>Mr. Arnold informs me that Det. Sinclair had, previous to this case, asked Mr. Arnold to dispose of drugs for him. Mr. Arnold refused, which gave Det. Sinclair incentive to try to get Mr. Arnold convicted as a means of retribution and/or silencing Mr. Arnold.</u> I honestly do not remember whether Mr. Arnold told me about the previous incident with Det. Sinclair at the time of his trial. It is possible that he did and I figured that, even though I had heard rumors about Det. Sinclair's illegal activity, it would be difficult to convince a jury that Det. Sinclair was engaging in crimes absent further proof and so it would be better to focus on other, more fruitful, areas of my defense.

Arnold's Reply to Respondents' Response to Petition for Writ of Habeas Corpus (Doc. #10), attached Exhibit A at 1, 2 (enumeration omitted) (emphasis added). While Ms. Brooks' statement leaves open the possibility that "rumors" regarding Sinclair may have come to the attention of the defense at the time of trial, Respondents nevertheless rightly concede that Arnold did not possess the favorable evidence and could not have obtained it with any reasonable diligence.

Concerning the matter of the State's "possession" of evidence within the meaning of the first Brady prong, and "suppression" of evidence under the third prong, Arnold contends that the prosecution team possessed and suppressed evidence favorable to his defense. Respondents contend that the prosecution could not suppress evidence that it did not possess. They argue that the favorable evidence was not suppressed by the prosecution because it was not within the prosecution's actual knowledge and was not imputed to them.

Arnold has not shown that Assistant State Attorney Pajcic personally knew that Sinclair was involved in criminal acts at the time of Arnold's arrest and prosecution. The Court accepts that, during the time that Pajcic prosecuted Arnold, Pajcic "was completely unaware" that Sinclair was involved in any criminal activity. Respondents' EH Ex. 4, Affidavit of Curtis Pajcic, dated March 30, 2004. Further, as of the date of Arnold's trial, no one

in the State Attorney's Office personally knew of any criminal conduct by Sinclair or of any state or federal investigation of Sinclair. The earliest possible date that the State Attorney's Office had information of Sinclair's criminality was in March 1999, several months after Arnold's October 1998 trial.[18] Detective David Bisplinghoff, who was Sinclair's partner in June 1998 through December 1998, stated that the earliest date he knew of Sinclair's criminal acts was August 27, 1999. EH Tr. at 9, 18, 20, 21. The federal investigation of Sinclair began and was publicly announced on September 9, 1999, approximately ten months after Arnold was sentenced (November 9, 1998). Respondents' EH Ex. 5.

That neither the prosecutor himself nor anyone in his office knew of Sinclair's illegal activity does not end the inquiry. Brady applies to exculpatory and impeachment information that is in the possession of the "prosecution team," which includes investigators and the police. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (rejecting state's argument that evidence known only to police but not prosecutor should escape Brady's disclosure requirements); United States v. Meros, 866 F.2d 1304, 1309 (11th Cir.) ("Brady and its progeny apply to evidence possessed by a district's 'prosecution team,' which includes both investigative

---

[18]   See Petitioner's Notice of Filing Transcripts (Doc. #48), filed April 30, 2008, Deposition Transcripts of Jay Plotkin (p.23-25), Mark Borello (p.32), Angela Corey (p.12-13), Laura Starrett (p.10, 25) and Detective David Bisplinghoff.

and prosecutorial personnel." (citing <u>United States v. Antone</u>, 603 F.2d 566, 569 (5th Cir. 1979)), <u>cert</u>. <u>denied</u>, 493 U.S. 932 (1989); <u>Porter</u>, 483 F.3d at 1305 ("[I]rrespective of the good faith or bad faith of the prosecution," "the prosecution is charged with a <u>Brady</u> violation" when "favorable, material evidence exclusively in the hands of the prosecution team fails to reach the defense."); <u>Moon v. Head</u>, 285 F.3d 1301, 1309 (11th Cir. 2002) (defining "prosecution team" as "the prosecutor or anyone over whom he has authority"); <u>see also</u> <u>United States v. Reyeros</u>, 537 F.3d 270, 281 (3rd Cir. 2008) (explaining that <u>Brady</u> requires disclosure of evidence known to prosecutor as well as "others acting on the government's behalf in the case" (citing <u>Kyles</u>), including evidence known to state police officers investigating the case); <u>Antone</u>, 603 F.2d at 569 (finding information known only to two investigators should be imputed to prosecutor; noting that "this Court has declined to draw a distinction between different agencies under the same government").

Thus, Arnold argues that Sinclair, as a lead investigator in Arnold's case (and the key testifying witness for the State), was indisputably a member of the prosecution team and his knowledge of his own criminal conduct is therefore properly imputed to the prosecution team.[19]  However, it might fairly be asked whether, when

---

[19]Arnold states that Sinclair's criminal conduct was known to other Jacksonville Sheriff's officers (Waldon, Pough and Bones) involved in the corruption and therefore their knowledge of

<u>Brady</u> requires the prosecution to "obtain and turn over . . . favorable evidence known to a state police officer who investigated the case," <u>Reyeros</u>, 537 F.3d at 281, is it really expected that such a rule would apply to the criminal wrongdoing of the police officer himself?  Indeed, several courts which have examined this issue have ultimately determined that evidence of an officer's criminal activity, known exclusively to the officer himself, need not be imputed to the prosecutor even though such evidence might be favorable to the defendant.  For example, in <u>United States v. Rosner</u>, the Second Circuit considered whether the perjury of a police officer, who "was himself aware of the full extent of his perjury about his past misconduct" was "attributable to the United States Attorney regardless of the actual knowledge of the Assistants who worked on the case." 516 F.2d 269, 278-79 (2nd Cir. 1975).  Finding that the officer was more than "an ordinary witness," the Second Circuit "would not agree" with the proposition that "an undercover agent can never be part of the 'prosecution' [such] that the prosecution can be held responsible for [the agent's] coercion of witnesses, his suppression of testimony or his

---

Sinclair's criminal activities and the budding investigation into those activities is properly imputed to the prosecution. Petitioner's EH Memorandum at 12; <u>see</u> Stipulation at 11, paragraph 6.  However, Waldon, Pough and Bones were not investigators or witnesses in Arnold's case.  Thus, Waldon, Pough and Bones were not part of the Arnold prosecution team and their knowledge of Sinclair's criminal acts or any investigation into his activities cannot be imputed to the Arnold prosecution under <u>Brady</u>.

own perjury which vitally affects the trial." _Id_. at 279. Nonetheless, in _Rosner_, a new trial was not required because the officer's "perjury was unrelated to the issues being tried and was related, on the contrary, only to collateral and cumulative impeaching material concerning the witness' own past misconduct." _Id_. Thus, the Second Circuit held that in such circumstances, the agent's perjury "should not be attributed to the prosecution." _Id_. at 280-81.

Similarly, in _People v. Vasquez_, 214 A.D.2d 93 (N.Y. App. Div. 1995), the court held that for _Brady_ purposes, "a corrupt police officer's knowledge of his own illegal conduct" which allegedly included "illegal searches," "thefts[,] and acts of routine brutality against suspects," could not be "imputed to the prosecution" where "the corrupt officer's illegal conduct was in no way related to defendant's prosecution" on criminal weapons possession charges. _Id_. at 95, 98. In so holding, the court noted that "the nature of the information concealed by [the corrupt officer] had no relationship to the case against the defendant, except as impeachment," and where there was independent evidence to support the verdict, the suppression of the evidence did not run afoul of _Brady_'s concern with "avoidance of an unfair trial to the accused." _Id_. at 99, 100. _See also_, _Campiti v. Matesanz_, 186 F.Supp.2d 29, 49-52 (D. Mass. 2002) (holding that while jury likely would have disregarded testimony from corrupt officer who stole

drug proceeds from defendant, failure to disclose it was not <u>Brady</u> violation because officer's testimony was cumulative of other evidence (including audio recordings of defendant and testimony of co-conspirators), the "sheer mass" of which was sufficient to support conviction); <u>Commonwealth v. Waters</u>, 571 N.E.2d 399 (Mass. 1991) (declining to impute to prosecution investigating officer's suppression of his own illegal conduct and observing that court had never done so before where officer acted in pursuit of his own illegal scheme, but noting further that independent eyewitness testimony from bystander confirmed officer's testimony such that verdict would be same even absent officer's testimony).[20]

Moreover, as Respondents correctly note, a <u>Brady</u> challenge involving the very same police officer whose knowledge of evidence favorable to the Arnold is at issue here- - former J.S.O. Detective Aric Sinclair- - has been heard and rejected by the undersigned and the Eleventh Circuit. In <u>Smith v. Crosby</u>, No. 3:03-cv-1036-J-32MCR, 2005 WL 3445528 (M.D. Fla. Dec. 14, 2005), <u>aff'd</u>, No. 06-10545, 2006 WL 4495336 (11th Cir. Dec. 27, 2006) (not selected for

---

[20]Though <u>Waters</u> supports the State's position here that an officer's corrupt activities should not be imputed to the prosecution, the <u>Waters</u> defendant, who unsuccessfully raised the issue as a motion for new trial based on the prosecution's use of perjurious testimony in violation of <u>United States v. Bagley</u>, 473 U.S. 667 (1985), could not have successfully raised the issue under <u>Brady</u> either because, as noted in a concurring opinion, the defendant himself was actually involved with the officer's illegal scheme. 571 N.E.2d at 404. Thus, Waters could not satisfy <u>Brady</u>'s second prong- - that the evidence was unknown to and could not be obtained by the defense. <u>Moon</u>, 285 F.3d at 1308.

publication in the Federal Reporter), <u>cert</u>. <u>denied</u>, 127 S.Ct. 2272 (2007), petitioner Smith was convicted on illegal drug charges following a jury trial at which Sinclair and several other police officers, as well as Smith's co-defendant, testified for the state. There, the Court found the petitioner failed to establish that the state prosecutor had information regarding the federal investigation of Sinclair for police corruption. 2005 WL 3445528, at *6. Unlike here, Smith did not argue that Sinclair was so intimately connected to the Smith investigation that Sinclair himself should be considered a member of the prosecution team; thus this Court did not take the next step to consider whether Sinclair's own knowledge of his illegal activities should have been imputed to the State.[21] Even if Smith had raised this issue, the result would have been the same because, as both this Court and the Eleventh Circuit found, Sinclair's testimony (at both Smith's trial and at an evidentiary suppression hearing) was either cumulative of other evidence, or not material to the decisions reached by the court and the jury. 2005 WL 3445528, *6-7; 2006 WL 4495336, *3-4.

---

[21]In <u>Smith v. Crosby</u>, both this Court and the Eleventh Circuit limited the imputation analysis to the issue petitioner Smith raised- - whether state prosecutors were aware of the criminal investigation of Sinclair. <u>See</u> <u>Smith v. Crosby</u>, Case No. 3:03-cv-1036-J-32MCR (M.D. Fla.), Docs. 1, 2, 15 (Smith's § 2254 petition and supporting briefs). Here, by contrast, Arnold directly raised the issue of whether Sinclair's own knowledge of his criminal misconduct was a matter to be imputed to the prosecution team. <u>See</u> Doc. 26-2 at 7-8 (Arnold's memorandum of law in support of amended petition).

Indeed, in the Smith case, Sinclair played a minor role in the criminal investigation of the defendant. His testimony at the suppression hearing was largely irrelevant, his testimony at the trial was relatively brief, and there was substantial other evidence (such as Smith stating to the police that the drugs were his and finding the bait money in Smith's pocket), that connected the defendant to the crimes. 2005 WL 3445528, *6-7; 2006 WL 4495336, *3-4. Thus, in Smith, habeas relief was not merited.[22]

The facts of Arnold's prosecution are distinguishable from Smith and the other cases cited above in which no Brady violation occurred. In those cases, the nature of the information known to the officer but not to the prosecutor either bore no connection to the evidence necessary to prove the crimes charged against the defendant, or the corrupt officer's testimony was tangential or cumulative such that the failure to produce it did not violate Brady. Here, by contrast, the nature of the information known to

_____

[22]Notably, this Court in Smith issued this caveat:

**While the subsequent federal conviction of Officer Sinclair is obviously a serious matter and the State's failure to disclose such a matter, whether advisedly or inadvertently, might, in other circumstances, constitute a Brady violation**, here the State's failure does not rise to the level of materiality, as the state court found. Petitioner, even in the absence of the allegedly undisclosed evidence, received a fair trial, one which resulted "in a verdict worthy of confidence."

Smith, 2005 WL 3445528, at *10 (citations omitted) (emphasis added).

Sinclair about his own contemporaneous illegal involvement with local drug dealing (i.e., threatening, shaking down, and otherwise co-opting local drug dealers) was the same as the nature of the evidence the prosecutor needed and secured from Sinclair to convict Arnold at trial for the sale and delivery of cocaine. Moreover, as further discussed below, it was Sinclair's ability to identify Arnold that was the key to the prosecution's case against Arnold. Indeed, as the prosecutor explained in his closing argument:

> Ladies and gentlemen, if there's still any doubt . . . whether or not Detective Thomas was able to make a positive identification [of Arnold], which he told you he was positive, [if] you still have any doubt that he made a positive identification, <u>you have Detective Sinclair's identification when he told you that there's no mistake, it was Darryl Arnold, I've known him for 20 years</u>.

Tr. 335 (emphasis added).

Sinclair was clearly a key member of the prosecution team whose information and testimony was vital to secure the conviction against Arnold. On such facts, Sinclair's knowledge of exculpatory or impeachment evidence is properly imputed to the prosecution because "when an investigating police officer willfully and intentionally conceals material information, regardless of . . . the otherwise proper conduct of the state attorney, the policeman's conduct must be imputed to the state as part of the prosecution team." <u>Freeman v. Georgia</u>, 599 F.2d 65, 69 (5th Cir. 1979). This is so because "[t]he police are also part of the prosecution, and

the taint on the trial [therefore] is no less if they, rather than the State's Attorney, were guilty of the nondisclosure." _Id_. (citation omitted). In other words, "[t]he duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of material information, the state's failure is not on that account excused." _Id_. at 70. On these specific facts, Sinclair's knowledge of his own criminal conduct, constituting evidence that would be favorable to the defense, demonstrates that the prosecution both "possessed" favorable evidence, in satisfaction of _Brady_'s first prong, and "suppressed" exculpatory or impeachment evidence, in satisfaction of _Brady_'s third prong.[23]

Finally, with respect to _Brady_'s fourth prong, Arnold must demonstrate that the suppressed evidence was material so as to establish prejudice. _See_ _Newton_, 44 F.3d at 918. Impeachment evidence is material for the purpose of _Brady_ "if there is a reasonable probability that, had the evidence been disclosed to the

---

[23]Given the necessity of Sinclair's information to the prosecution of Arnold and the similarity of Sinclair's criminal activities to the nature of the evidence used to convict Arnold, Arnold has adequately demonstrated that Sinclair was a member of the prosecution team and his information should be imputed to the prosecutor. Therefore, the Court need not take the further step of determining the veracity of Arnold's claim that Sinclair had previously tried without success to coerce Arnold into participating in Sinclair's illegal drug crimes (as Sinclair had done with other local drug sellers, _see_ Stipulation at 4-6), thereby giving Sinclair a motive to lie about Arnold as a means of seeking retribution against Arnold for his rebuffs.

defense, the result of the proceeding would have been different."

United States v. Bagley, 473 U.S. 667, 682 (1985); see Porter, 483

F.3d at 1303 (reiterating standard); Kelley v. Sec'y for Dept. of

Corrs., 377 F.3d 1317, 1354 (11th Cir. 2004) (same).      In

considering whether Arnold has made this showing, "[t]he question

is not whether the defendant would more likely than not have

received a different verdict with the evidence, but whether in its

absence he received a fair trial, understood as a trial resulting

in a verdict worthy of confidence;" thus, Arnold may demonstrate a

Brady violation by "showing that the favorable evidence could

reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict." Kyles, 514 U.S. at 434,

435 (footnote omitted).[24]

     At Arnold's trial, Detective Thomas testified that he was

undercover and posing as a drug user/buyer.[25]   Tr. at 149, 151.

Sinclair, assigned as his partner, was working with Thomas on May

---

     [24]Thus, a showing of "materiality" within the meaning of the
fourth prong is a much higher standard to meet than the showing of
"favorable" evidence within the meaning of Brady's first prong
(which in this case, Respondents concede Arnold has been met,
Respondents' EH Memorandum at 9-10).

     [25] Detective Thomas testified that he had been employed with
the JSO for nine and a half years and had been working in the
narcotics division for two years and seven months.   Tr. at 149.
Detective Sinclair stated that he had been employed with the JSO
for five years with one year in the narcotics division.   Id. at
202.  On May 27, 1998, they were both narcotics detectives assigned
as partners, working undercover and posing as drug users/buyers.
Id. at 151, 204.

27, 1998. Id. at 151. Thomas identified Arnold as the individual who sold him cocaine on that afternoon. Id. at 152. Thomas described how he first made contact with Arnold:

> I had just conducted a drug transaction a little before I made contact with the defendant. As I was walking back to the undercover vehicle, the defendant was on a bicycle and as he passed me, we made eye contact with each other. At that time I said, "What's up, dog?" He turned around, looked back at me and said, "What's up." He rode back over to me. I said, "Dog, I'm looking for 40 hard.[26]"

Id. at 153.

At this time, Sinclair was sitting in the undercover vehicle. Id. at 154. Thomas asked the drug seller to sell cocaine to his partner so that Sinclair could also see him. Id. at 155, 158. Thomas saw the seller ride his bicycle to the passenger side of the undercover vehicle, make eye contact with Sinclair and then "hastily" ride off on his bicycle in the other direction, calling out to Thomas in response to his shouts that he [the seller] would return later. Id. at 162-63.

Sinclair explained to Thomas that Sinclair and the seller recognized each other and that the name of the individual who sold Thomas the crack cocaine was Darryl Arnold. Id. at 163, 168. Based on Sinclair's supplying the name, on the following day

---

[26]Thomas explained to the jury that in street lingo, "40 hard" meant Thomas was looking to purchase forty dollars worth of crack cocaine. Tr. 153-56.

Officer Thomas was able to locate a prior photograph of Darryl Arnold. <u>Id</u>. at 168. He testified that when he looked at the photograph, he made a positive identification, with no doubt in his mind at all. <u>Id</u>. at 168, 190, 194.

However, on cross-examination, Thomas testified that, during the drug transaction, he and the seller "<u>were kind of standing side by side to each other so [Thomas] didn't get a clear shot of [the seller's] face, just the side of his face, kind of.</u>" <u>Id</u>. at 180 (emphasis added). Thomas did not see "his entire facial features." <u>Id</u>. He concluded that he "got a positive look at him," and saw the seller's eyes but did not see his whole face, just a portion of his face because the seller "was straddled over his bicycle" and "didn't fully turn to [Thomas]." <u>Id</u>. Thomas acknowledged that although as a detective he was trained to remember details of a person's appearance, he was unable to identify other key details about the seller's appearance, such as whether he was wearing a hat, what his clothing looked like, whether he had any facial hair, scars,[27] or missing teeth. <u>Id</u>. at 180-82. In fact, the only details Thomas actually could remember were these two: the seller was "dark complected" and "scraggly." <u>Id</u>. at 182.

---

[27]Arnold claims to have a prominent facial scar. In her closing argument at trial, Arnold's counsel described this scar as running from the "bottom of [Arnold's] eye over to his cheek," Tr. 363, and suggested to the jury that they could see for themselves that it was prominent enough that Thomas should have noted it. Tr. 363, 365-66.

Sinclair also testified at Arnold's trial, describing what he first saw when he was acting "as a back-up" for Thomas. <u>Id</u>. at 232.

> Well, while sitting in the vehicle, I was looking through the rear view mirror. As I was looking through the rear view mirror, I noticed a black male on a bicycle holding a conversation with Detective Thomas. I kept my eyesight on him for officer's safety to make sure nothing happened.
>
> . . . .
>
> I was going as a back-up for Officer Thomas.
>
> . . . .
>
> Well, that's the reason I didn't make any undercover buys in the Springfield area, because I felt like I was known. I was there solely as back-up to Officer Thomas for officer safety.

<u>Id</u>. at 205-06, 232-33.[28]

Sinclair testified that, as the seller began to approach the vehicle's window, he recognized him to be Darryl Arnold. <u>Id</u>. at 209, 210. He explained that the seller did not sell him cocaine, but rather "turned immediately, with a shocked looked on his face and just fled." <u>Id</u>. at 210, 216. Sinclair told Thomas who the person was. <u>Id</u>. at 223. Sinclair knew it was Darryl Arnold who had made the sale that day because he had known Arnold for at least twenty years. <u>Id</u>. at 224, 234. The prosecutor called Detective

---

[28]No explanation was offered to the jury as to why Thomas asked the seller to approach Sinclair to sell him cocaine if Sinclair was likely to be recognized.

Sinclair back to the stand for rebuttal to confirm that he had known Arnold for a long time and that he had no "grudge" against Arnold or his family that might cause him to falsely accuse Arnold. Id. at 307-08.

In the opening statement, the prosecutor stated that following the drug sale, "Detective Thomas received information with regard to the person's name from Detective Sinclair . . . ." Id. at 145. Further, during the closing argument, the prosecutor pointed out to the jury that there were two identifications of Arnold. Specifically, he described Thomas' identification.

> We know that Detective Thomas was hand-to-hand with this person who sold him the cocaine, right there on the street, middle of the day. He was candid with you, he told you he didn't see his entire face, he was sideways to him as he made the deal, but he saw his face, spoke with him, interacted, close-up and personal.
>
> He had his image fresh in his mind with the name that had been provided to him by the person that knows him [Sinclair]. He, himself, didn't just take that at face-value. He, himself, went and pulled a prior photograph of the person. With that information he looked at it and it was the same person. Not weeks later. The very next morning, and for that reason, ultimately he got an arrest warrant. That's one identification.
>
> And, again, we're not talking about a dark alley, quick split-second, we're talking about a trained officer who looks at the person who interacted with him, spent some time with him, within an arm's length.

Id. at 330-31 (emphasis added).

The prosecutor recognized, however, that Thomas' ability to identify Arnold was largely dependent on Sinclair's identification of Arnold and the prosecutor suggested to the jury in his closing that if the jury "still had any doubt" based on Thomas' identification, they need do no more than rely on the credible testimony of Detective Sinclair, who had known Arnold for twenty years. Id. at 335. In describing Sinclair's identification of Arnold, the prosecutor noted that it was "the strongest possible identification you can have" because "[i]t's a person that . . . grew up with him, saw him daily at the park." Id. at 331 (emphasis added). The prosecutor further urged the jury to rely on Sinclair's reputation as a law enforcement officer:

> Detective Sinclair has a sworn duty and he's doing his job. If somebody breaks the law, it's his job to uphold that law and he did his duty, he did his job, just like he did when he came in here yesterday and took the oath and told you what happened out there, what he saw and who sold him that crack cocaine, and he sits right there before you.

Id. at 332-33. The prosecutor specifically highlighted the fact that Sinclair had no interest in the outcome of the case since he was just doing his job and that he testified honestly, whereas Arnold had "a big interest" in the outcome of his case and was not credible. Id. at 374-75. In rebuttal, the prosecutor reemphasized the credibility of the State's witnesses, stating (ironically):

"There's no evidence of any crimes committed by any of the State's witnesses." Id. at 376 (emphasis added). The prosecutor further

contended "[t]here's absolutely no evidence there's any reason in the world Detective Sinclair would want this man to be falsely accused for something he didn't do. He's here because he did it." Id. 369 (emphasis added).

To satisfy Brady's materiality standard, Arnold must demonstrate that, had the favorable evidence been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different. Porter, 483 F.3d at 1303; Kelley, 377 F.3d at 1354; Moon, 285 F.3d at 1308. Here, where the prosecutor placed such great emphasis on the credibility of Sinclair, evidence which would tend to impugn Sinclair's credibility would be particularly probative. United States v. Gordon, 246 F.Supp. 522, 525 (D.C.D.C. 1965) (explaining that even where the defendant's account lacks full credibility, in a case where the jury must decide whether to believe the defendant or the complaining witness, evidence which raises a question as to the witness' credibility may be enough to  create a reasonable doubt as to the defendant's guilt); see also Rosner, 516 F.2d at 274 (noting that concern might be legitimately raised if corrupt officer's testimony falsely presented "a witness of assumed moral rectitude whose collapse from virtue might destroy the foundation of the prosecution case"). Although Arnold's trial counsel attempted to highlight discrepancies between Sinclair's testimony and the testimony of Arnold and his mother regarding the basis for

Sinclair's ability to identify Arnold (such as contrasting Sinclair's testimony that both he and Arnold attended the same high school, Tr. 212, with Arnold's and his mother's testimony that Arnold did not, Tr. 272, 296 (a contention since bolstered with school records)), Tr. 357-361, by its verdict, the jury very likely credited Sinclair's testimony. These circumstances raise a significant possibility that, had the jury known about Sinclair's own illegal drug dealing and other criminal activities occurring in the same environs at the same time, Sinclair's testimony likely would have been discredited by the jury, who "would have been unlikely to put much stock in the words of a corrupt officer."[29] Moreover, Thomas' ability to identify Arnold (which was largely influenced by Sinclair) would have been scrutinized more closely and the testimony of Arnold and his mother might well have been accorded more weight. Certainly, the prosecutor would have been disabled from portraying Sinclair as a paragon of credibility and virtue. No doubt, the evidence concerning Sinclair's crimes is material under Brady.

Respondents, however, contend that Arnold cannot meet the materiality requirement because evidence of Sinclair's criminal conduct would not have been admissible at trial. Respondents' EH Memorandum at 16-17 (citing Breedlove v. State, 580 So.2d 605, 607-08 (Fla. 1991) and Delap v. Dugger, 890 F.2d 285, 299 (11th Cir.

---

[29] Campiti, 186 F.Supp.2d at 50.

1989), cert. denied, 496 U.S. 929 (1990)). See also, State v. Bullard, 858 So.2d 1189, 1191-92 (Fla. 2d DCA 2003) (citing Breedlove and holding that unrelated evidence of deputy's suspension would not have been admissible so was not material). Arnold distinguishes those cases, noting that Sinclair's criminal conduct is not unrelated and is in fact "of the very same kind for which Arnold was arrested and prosecuted." Petitioner's EH Memorandum at 17. Indeed, at the very time Sinclair was implicating and testifying against Arnold, he was consorting with known drug dealers and using his status as a police officer to get these drug dealers to do his bidding.[30] Sinclair identified Arnold to Thomas as the drug seller and then provided sworn testimony against Arnold at the very time he was knee deep in drug crimes, extortion, robbery and being an accessory to murder on the very same streets, demonstrating that his information would be unlikely to be treated as "unrelated" inadmissible evidence under Breedlove.

Moreover, while the State Attorney's Office had no formal system cataloguing all cases in which Sinclair had been involved, once Sinclair's illegal activities became public, prosecutors attempted to find and review cases (many of which were brought to the State's attention by public defenders and retained defense counsel) to determine whether Sinclair's involvement in any of

---

[30]Though not proven, Arnold made a similar allegation here that Sinclair unsuccessfully tried to co-opt Arnold. See pp. 31-32, supra.

those cases was such that the State no longer had confidence in the verdicts. Mark Borello, who was the Director of the repeat offender division at the time Sinclair's illegal activities became known, testified that cases connected to Sinclair were reviewed to determine whether any independent corroborating evidence supported Sinclair's testimony or personal involvement. Doc. 48, Borello depo., at 41. Where such evidence did exist, the State's position was that the verdict should be maintained. On the other hand, where Sinclair's testimony could not be independently corroborated through other evidence, the State "would have agreed to post-conviction relief," and in some cases, "in fact [the State] did." Id. at 20.

Angela Corey, who at the time was a division chief within the State Attorney's Office, testified that the conviction of Theodis Hagins for attempting to shoot Detective Sinclair was such a case because Detective Sinclair was the main witness to the crime (there being "issues" with the State's other eyewitnesses). Doc. 48, Corey depo., at 24. Prosecutors believed the Hagins verdict was problematic because Hagins was a drug dealer and so, as it turned out, was Sinclair. Id. at 27. Thus, notwithstanding that there were other eyewitnesses and that Corey believed Hagins did shoot at Sinclair, Sinclair could not be put on the stand as a credible witness and the State therefore did not oppose Hagins' motion for post-conviction relief. Id. at 24-29. Corey, who is now the

elected State Attorney, commendably explained that as a prosecutor deciding whether to bring a case to trial, "our job is to seek the truth, not just meet legal elements." Id. at 34.

Jay Plotkin, who was the chief assistant in the State Attorney's Office when Sinclair's corruption was finally exposed, testified that the state revisited convictions where the evidence was based on Sinclair's credibility and testimony. Doc. 48, Plotkin depo., at 13. According to Plotkin, the State Attorney's Office was "obviously very, very concerned that you had this horrific breach of duty, to put it mildly, and we wanted to do the right thing" and did whatever had to be done to review every case. Id. at 17. Plotkin testified that the State would not proceed with a case based solely on testimony of a corrupt police officer. Id. at 42.

Borello, who reviewed Arnold's case in relation to his state motion for post-conviction relief, stated that he talked to Detective Thomas to determine "whether or not we could independently prove Mr. Arnold's guilt separate from Detective [Sinclair]'s involvement." Doc. 48, Borello depo., at 10. Borello explained that upon conferring with Detective Thomas and reviewing the State's file, Borello determined that independent evidence supported the conviction. Thus, Borello wrote to Susan Brooks, Arnold's trial counsel, that "[i]t would appear that Officer Sinclair was not the officer who bought cocaine from your

client, and in fact another officer in addition to Sinclair identified your client as the seller[;]" thus, "the case did not rest soley [sic] on Sinclair's credibility" and the State therefore declined to agree to any post-conviction relief for Arnold. <u>Id</u>. at Ex. 3. Therefore, the State seeks to defend this conviction, though Sinclair was integral to Arnold's arrest and subsequent conviction and there is a real question whether Thomas could have ever identified Arnold without Sinclair.

However, notwithstanding that its internal investigation did not result in post-conviction relief for Arnold, the State has conceded that, had it known of Sinclair's activities, it would not have put him on the stand. Respondents' EH Memorandum at 9. Thus, the <u>Breedlove</u> issue regarding the admissibility of Sinclair's testimony is effectively moot. If the information regarding Sinclair had been disclosed to the defense, so too would it have been known to the prosecution and, as the State agrees now that it would not have put Sinclair on the stand against Arnold, the admissibility of the impeachment evidence against Sinclair would never be an issue.[31]

---

[31]The result reached here would not be different even if the State had not made this concession. Given that the nature of Sinclair's criminal activities was of the very same kind for which Arnold was arrested and prosecuted, <u>Breedlove</u>'s concern with the admissibility of "unrelated" evidence would not be an issue.

## V. Conclusion

In the absence of the undisclosed evidence of Sinclair's crimes, Darryl Arnold did not receive a fair trial.[32] <u>Kyles</u>, 514 U.S. at 434; <u>Jennings v. McDonough</u>, 490 F.3d 1230, 1237 (11th Cir. 2007) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (citing <u>Kyles</u>, 514 U.S. at 434)), <u>cert</u>. <u>denied</u>, 128 S.Ct. 1762 (2008); <u>Delap</u>, 890 F.2d at 299 ("The purpose of the <u>Brady</u> rule is to ensure that a criminal defendant receives a fair trial.") (citations omitted). While the Court hopes that the scenario of a corrupt police officer being a principal state investigator and trial witness would be relatively rare, the <u>Brady</u> rationale, which asks whether the "suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," <u>Stephens</u>, 407 F.3d at 1203, dictates that <u>Brady</u> applies in these circumstances. Indeed, the illegal activities of Sinclair (many of which were strikingly close to the drug offense for which Arnold was prosecuted), which were occurring at the precise time he was identifying Arnold as the perpetrator and then testifying against him at trial, and Sinclair's failure to disclose those

---

[32]Of course, that Arnold has a number of previous convictions and is not a particularly sympathetic defendant does not affect his right to a fair trial on these charges.

activities to the prosecution so the prosecutor could disclose them to the defense, creates "a reasonable probability that the outcome would have been different." <u>Newton</u>, 44 F.3d at 918. That the prosecution unknowingly facilitated Sinclair's treachery by telling the jury to rely on Sinclair's credibility as a sworn police officer worthy of belief and above reproach renders the verdict here all the more suspect.

As acknowledged by Respondents, the notorious and wide-ranging criminal conduct of Detective Aric Sinclair was a breach of the public trust of the highest order. Indeed, because of Sinclair's activities, the State Attorney's Office revisited and dismissed a number of criminal convictions obtained with Sinclair's assistance. In Arnold's case, the State's failure to disclose to the defense the evidence about Sinclair's corruption, even if inadvertent, constitutes a <u>Brady</u> violation:

> In the criminal or habeas context, a prosecutor's culpability is irrelevant for purposes of demonstrating a procedural due process violation based on a <u>Brady</u> nondisclosure. That is, a defendant establishes a <u>Brady</u> violation in the criminal or habeas context whenever he can show that favorable evidence material to his case was not disclosed to the defense, "*irrespective of the good faith or bad faith of the prosecution*." <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1197 (emphasis added); <u>see</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 288, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) ("[U]nder <u>Brady</u> an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment"); <u>Agurs</u>, 427 U.S. at 110, 96 S.Ct. at 2401 ("If the suppression of

> evidence results in constitutional error, it
> is because of the character of the evidence,
> not the character of the prosecutor"). **The
> Brady rule thus imposes a no-fault standard of
> care on the prosecutor. If favorable, material
> evidence exclusively in the hands of the
> prosecution team fails to reach the defense-
> for whatever reason- and the defendant is
> subsequently convicted, the prosecution is
> charged with a Brady violation, and the
> defendant is entitled to a new trial**. . . .

Porter, 483 F.3d at 1305 (emphasis added) (footnote omitted).

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.    The Amended Petition for Writ of Habeas Corpus (Doc. #26) is hereby conditionally **GRANTED**, subject to paragraph 2.

2.    Petitioner's conviction is **VACATED,** and Respondents are directed to forthwith take all action necessary to ensure that the state trial court is apprised of this ruling, that trial counsel is appointed to represent Arnold, and that a new trial (or other appropriate disposition) is ordered in an expeditious fashion.

3.    Respondents, no later than **July 1, 2009**, shall notify the Court as to the date of the new trial or other disposition of Petitioner's case.

4.    The Clerk of Court shall enter judgment accordingly.

5.    The Clerk of Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this <u>31st</u> day of March, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

c:
Counsel of Record